Tab 1

*Conley v. Dan-Webforming Int'l A/S (Ltd.)*, 1992 U.S. Dist. LEXIS 20251 (D. Del. Dec. 29, 1992)
Case 3:05-cv-00275    Document 38-1    Filed 07/22/05    Page 1 of 11 PageID #: 534

JOHN T. CONLEY AND CLARK L. POLAND, Plaintiffs, v. DAN-WEBFORMING INTERNATIONAL A/S (LTD.), a Danish corporation, SCAN-WEB I/S, a Danish limited partnership, SCAN-WEB OF NORTH AMERICA, INC., a dissolved Delaware corporation, JOHN MOSGAARD AND HELGE KONGSTED, Defendants.

Civil Action No. 91-401 MMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

1992 U.S. Dist. LEXIS 20251

December 29, 1992, Decided

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff operating officers of dissolved corporation sought summary judgment in an action against defendants, foreign corporations, dissolved corporations, and two former owners of dissolved corporation, for breaching the settlement agreement among the parties that arose out of the dissolution of the corporation. The corporations and the owners also sought summary judgment.

**OVERVIEW:** The officers and the owners had each owned 25 percent of the dissolved corporation. The court concluded that: (1) the corporations and the owners could not seek a rescission of the agreement because their first allegation of fraud was precluded by releases they had signed, and the second allegation of fraud was insufficient as a matter of law; (2) of the three transactions for which the officers sought commissions, they were owed commissions from the first because it met the terms of the settlement agreement; (3) the terms of the agreement regarding the corporations and the owners' reporting requirements were not modified by the officers' cashing of a check they had received for certain sales under the agreement, and there was no language in the accompanying letter that indicated it was an offer to settle a good faith dispute; (4) the corporations and the owners failed to use their best efforts to comply with the provisions of the agreement because they did not offer any explanation for their failure to comply with the reporting requirement;, and (5) one officer did not breach the covenant not to compete and the other did not as to one company, but did as to another.

**OUTCOME:** The court granted summary judgment to the officers in part and denied it in part and granted summary judgment to the corporations and officers in part and denied it in part.

**CORE TERMS:** summary judgment, territory, customer, license, technology, covenant, machine, counterclaim, compete, dry, forming, reporting, rescission, air-forming, qualify, accord and satisfaction, individual liability, licensing agreement, purchaser, certification, licensed, install, stockholder, correspondence, modification, accountant, chartered, affiliate, missing, enter summary judgment

**LexisNexis(TM) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN1]Fed. R. Civ. P. requires a district court to enter summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN2]Applied specifically to contract disputes, if the moving party presents the only reasonable interpretation of the contract's language, and the pertinent facts are not in dispute, the district court will enter summary judgment. On the other hand, if the non-moving party presents a reasonable reading of the contract, then a question of fact exists which can only be resolved at trial. If the contract language admits of only one interpretation, factual questions may arise as to whether the parties have fulfilled their obligations under the contract. In seeking to resolve these issues and factual issues unrelated to the terms of the contract, the district court must apply the applicable standards for summary judgment. On such issues, the non-moving party must have placed in the record sufficient evidence for the district court to find a genuine issue of material fact.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN3]The plain language of Fed. R. Civ. P. 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case; and on which that party will bear the burden of proof at trial. It is not enough for the nonmoving party to have provided a scintilla of evidence supporting its position. The district court will enter summary judgment if the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN4]It is not the district court's task to replace the trier of fact and to resolve questions about which genuine factual issues exist. The district court will only enter summary judgment if no rational trier of fact could weigh the evidence and find for the nonmoving party. At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.

*Contracts Law > Contract Interpretation > Interpretation Generally*

[HN5]It is a basic tenet of contract construction that where a contract contains inconsistent terms, the specific term qualifies the general.

*Contracts Law > Contract Interpretation > Interpretation Generally*

[HN6]Under Delaware law, a court should seek a construction that will give full force and effect to all of the provisions of the agreement.

*Contracts Law > Performance > Discharges & Terminations*

[HN7]Once executed and delivered, an effective release terminates the rights of the party executing and delivering the release and an effective release is a bar to recovery on the claim released. In both instances, a court must begin by looking to the language of the release as provided in the agreement. If the language clearly establishes a release from liability, the presumption is that the parties executing such a formal agreement intended what they said.

*Contracts Law > Remedies > Rescission & Redhibition*

[HN8]The elements of a claim for rescission are: (1) a misrepresentation occurred; (2) the misrepresentation was fraudulent or material; (3) the party with the claim was induced into the contract by the misrepresentation; (4) the party so induced was reasonable in relying upon the misrepresentation.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*

[HN9]The rule requires summary judgment if the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. This standard does not prevent the entry of summary judgment simply because some showing has been made with regard to an essential element. The standard instead requires "a sufficient showing on an essential element".

*Contracts Law > Contract Interpretation > Interpretation Generally*

*Contracts Law > Contract Interpretation > Parol Evidence Rule*

[HN10]In interpreting a contract, the language of the agreement must be the starting point. This is so because, as an initial matter, courts must seek the intent of the parties and the intent of the parties must be ascertained from the language of the contract. When examining the language of the contract, if the language of the contract is not in any sense ambiguous, its meaning is ordinarily a question of law for the court to ascertain from the instrument itself. When there is uncertainty in the meaning and application of the contract, a court will consider testimony pertaining to antecedent agreements, communications, and other factors, which bear on the language of the contract. However, if the instrument is clear and unambiguous on its face, a court may not consider parol evidence to interpret it or search for the parties' intentions.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN11]At the summary judgment stage, a district court will only enter summary judgment if the moving party has presented the only reasonable reading of the contract terms at issue, or if the record lacks adequate support for the non-moving party's position. If the contract proves susceptible to more than one reasonable reading, or the nonmovant has "made a sufficient showing" as to any issue, summary judgment will be denied.

*Contracts Law > Performance > Accord & Satisfaction*

[HN12]To find an accord and satisfaction, the law of Delaware requires there must not only be a new agreement based on an offer, and the acceptance of that offer, as made, like any other contract, but that agreement must also be acted on. In addition, there

must be a factual basis to show that the accord and satisfaction resulted from a bona fide dispute based on mutual good faith. Acceptance of a check may amount to the acceptance of new contract terms, if the check itself amounts to an offer.

*Contracts Law > Contract Conditions & Provisions > Conditional Duties Generally*

[HN13]Under Delaware law, "best efforts" clauses have been held enforceable and the failure of a party to exercise best efforts can form the basis for liability in a breach of contract action. Best efforts clauses often arise in circumstances in which the completion of contractual obligations requires certain conditions to occur or not to occur. The best efforts clause often insures the parties will do their best to accomplish the conditions necessary to complete the contract.

*Contracts Law > Remedies > Equitable Relief*

[HN14]Under Delaware law, covenants not to compete are enforceable in equity provided the imposed restraint is reasonable both as to its geographic extent and as to the burden it places upon the person who covenants not to compete by engaging in a particular form of business activity.

*Contracts Law > Contract Conditions & Provisions > Conditions Precedent*

[HN15]For plaintiffs to recover any damages under Delaware law, they first must show freedom from fault with respect to performance of dependent promises, counterpromises or conditions precedent.

**COUNSEL:** [*1] Kevin G. Abrams, Esq., J. Michael Christopher, Esq., and Matthew J. Ferretti of Richards, Layton & Finger, Wilmington, Delaware; attorneys for plaintiffs.

Matthew B. Lehr, Esq., Robert Valihura, Jr., Esq., and William M. Lafferty, Esq., of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Of Counsel: Steven M. Richman, Esq., of Foyen & Partners, Short Hills, New Jersey; attorneys for defendants.

**JUDGES:** SCHWARTZ

**OPINIONBY:** MURRAY M. SCHWARTZ

**OPINION: MEMORANDUM OPINION**

Dated: December 29, 1992
Wilmington, Delaware

**SCHWARTZ, Senior District Judge**

A complaint filed in this Court by plaintiffs, John T. Conley and Clark L. Poland, on July 12, 1991, named as defendants two Danish entities, Dan-Webforming International A/S (Ltd.) [Dan-Web], and Scan-Web I/S [Scan-Web], Scan-Web of North America [SWNA], a single dissolved Delaware corporation, and two individuals, John Mosgaard ["Mosgaard"] and Helge Kongsted ["Kongsted"]. Docket Item ["D.I."] 1. This Court has diversity jurisdiction under 28 U.S.C. § 1332 (1988). n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n1 Plaintiffs seek a declaratory judgment under their fourth count. Under the Declaratory Judgment Act, "the statute itself is not the basis for jurisdiction; jurisdiction must be created independently of the statute." Millipore Corp. v. University Patents, Inc., 682 F. Supp. 227, 231 (D. Del. 1987) (finding justiciable controversy and denying motion to dismiss); Federal Kemper Ins. Co. v. Rauscher, 807 F.2d 345, 351 (3d Cir. 1986).

- - - - - - - - - - - - End Footnotes- - - - - - - -

[*2]

The plaintiffs have alleged four claims, each stemming from the Settlement Agreement reached between these parties in 1989. Defendants, in turn, have asserted four counterclaims, two of which arise from the same 1989 Settlement Agreement and two of which are not at issue here. n2 Plaintiffs seek summary judgment on all four of their counts, and on two of the defendants' counterclaims. Defendants have moved for summary judgment on part of the plaintiffs' first count and plaintiffs' third claim.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n2 According to the conclusion to their brief, plaintiffs believe they are "entitled to summary judgment on all issues in this action." D.I. 54 at 49. The plaintiffs' failure to address the defendants' third and fourth counterclaims, however, precludes this Court from considering a motion on those claims.

- - - - - - - - - - - - End Footnotes- - - - - - - -

For the reasons which follow, summary judgment will be granted in part and denied in part as to the plaintiffs' first count. The first count of the complaint has three

components: the Flakt Agreement, the UPM Agreement, [*3] and the Walkisoft sale. Summary judgment will be granted to defendants on the issue of the individual liability of Kongsted and Mosgaard for any commissions due under the Settlement Agreement because of these transactions. Summary judgment will be granted to plaintiffs as to liability for a commission under the Flakt Agreement, but damages remain to be determined. Summary judgment will be denied to plaintiffs on their alleged right to a commission based upon a grant of a license to UPM, and will also be denied to both plaintiffs and defendants on the plaintiffs' third claim for a commission which concerns the sale from UPM to Walkisoft.

On plaintiffs' second count, relating to reporting requirements under the 1989 Settlement Agreement, summary judgment will be granted for plaintiffs. Plaintiffs will also be granted summary judgment, and defendants denied it, on plaintiffs' third count, a claim arising from the breach of a "best efforts" clause. On the plaintiffs' fourth count, seeking a declaratory judgment that plaintiffs did not violate a covenant not to compete, and defendants' second counterclaim, asserting plaintiffs violated the same covenant, summary judgment will be granted [*4] as to plaintiff Poland, and as to plaintiff Conley's association with Walkisoft. However, summary judgment will be denied with regard to Conley's association with UPM. Finally, on defendants' first counterclaim, seeking rescission on the grounds of fraud, summary judgment will be granted for the plaintiffs.

I. Facts

On May 1, 1981, Dan-Web entered into an exclusive licensing agreement with SWNA. D.I. 61 at Tab 2. The purpose of the license was to allow Dan-Web "to exploit and develop the North American market for dry formed fibre products and ancillary products based on [Dan-Web's] technology, systems processes machinery, equipment and products . . . ." Id. Dan-Web, in turn, had licensed certain technology from Scan-Web, a partnership organized under the laws of Denmark. Id. Defendant Mosgaard was, and apparently still is, president of Dan-Web and both Mosgaard and Kongsted are partners in Scan-web. D.I. 47 at A, 16; D.I. 59 at 6.

The two plaintiffs, John T. Conley ("Conley") and Clark L. Poland ("Poland"), and two of the defendants, Mosgaard and Kongsted, each owned a twenty-five percent share of SWNA's outstanding stock. D.I. 1 at P 11; D.I. 4 at P 11. [*5] Mosgaard and Kongsted maintained a passive role, while Conley and Poland acted as the principal operating officers of SWNA. D.I. 1 at P 12; D.I. 4 at P 12.

Eventually, this business arrangement turned sour. In 1988, Mosgaard and Kongsted filed a complaint in the Court of Chancery for the State of Delaware. D.I. 61 at Tab 3. Among other claims, the complaint alleged breaches of fiduciary duties by plaintiffs Conley and Poland, and sought dissolution of SWNA under Delaware Corporation Law. Id. (citing Del. Code Ann. tit. 8, §§ 226(a), 291 (1991)). In the alternative, the complaint sought the appointment of a custodian. Id. (citing Del. Code Ann. tit. 8, § 226 (1991)).

The action in the Chancery Court was settled on April 21, 1989. D.I. 47 at A. The parties to the Settlement Agreement included Poland, Conley, Mosgaard and Kongsted, Scan-Web, SWNA and Dan-Web. Id. at 1. The Settlement Agreement contains fourteen sections, a number of which are involved in this litigation. Primarily at issue are sections four, five, six, eight, ten, eleven and fourteen.

A. Overview of Settlement Agreement Provisions

Section four, entitled "Payments for Restrictive Covenants", [*6] sets out a system of commissions that Dan-Web and certain other parties would pay to plaintiffs if certain conditions were met. Id. at § 4(a), (b). Section four also imposes two distinct reporting requirements on defendants. Id. at § 4(d)(i), (e). Section five requires Dan-Web and others to use their "Best Efforts" in securing the transactions which lead to commissions and in fulfilling their obligations under the Agreement. Id. at § 5. Section six contains "Releases" by which each party releases the other from certain liability, but expressly excludes obligations under the Agreement. Id. at § 6. In section eight, plaintiffs agreed to a "Non-compete Covenant". Id. at § 8. Section ten, paragraph (b), contains a clause which excludes defendants Mosgaard and Kongsted from "individual liability." Id. at § 10(b). The same section, in paragraph (f), echoes section five's best efforts requirements by proscribing defendants, among others, from acting in a manner which "adversely effects any of their obligations . . . under this Agreement." Id. at § 10(f). In section eleven, paragraph (e), plaintiffs warranted that nothing had occurred, or was occurring, [*7] which would amount to a default under the agreement. Id. at § 11(e). Finally, in section fourteen, the Agreement provides rules to govern any subsequent modification of the Settlement Agreement. Id. at § 14(e).

B. Chronology of Major Transactions

With its previous North American connection now severed, Dan-Web apparently needed a new American contact. Three months later, on September 15, 1989, Dan-Web and Flakt, Inc., Drying Systems ("Flakt"), a Delaware Corporation, with its principal place of

business in Knoxville, Tennessee, entered into a five year, renewable licensing agreement ("Flakt Agreement"). D.I. 61 at Tab 10. This agreement has become one of the three major transactions at issue in this lawsuit.

Under the terms of the agreement, Dan-Web gave to Flakt an "exclusive license in the TERRITORY to use the PATENTS and KNOW-HOW to sell, manufacture, install, commission and service the PRODUCTS and components used in the dry forming of fibre webs, as owned by Dan-Web on the date of this Agreement." Id. at § 2(A)(1). The agreement defined the territory as "the United States of America, Canada, Mexico" and certain Central American nations. Id. at [*8] § 1(9). n3

------------- Footnotes ---------
------

n3 The Agreement defined KNOW-HOW as:

(a) all technical and commercial knowledge including market and customer information, experience and skill possessed by Dan-Web by the date of this Agreement. (b) all manufacturing, production, operating, testing, repair and other related technological data and information, and (c) all design, and other drawings, methods, processes, performance data, designs and other specifications and technological information and trade secrets, owned by Dan-Web by the date of the signing of this Agreement, and which are necessary to enable Flakt to manufacture, sell, test, install, and service the PRODUCTS (as defined below) pursuant to the terms of this Agreement.

D.I. 61 at Tab 10, § 1(4). The Agreement defined PATENTS as, "all patents, patent applications, trademarks and trademark applications held or filed by Dan-Web by the date of this Agreement . . . ." Id. at § 1(6). PRODUCTS was defined as "all machine components and equipment necessary to produce a dry formed finished fibre web material ready for converting into end-products." Id. at § 1(7). The licensing agreement contained appendices listing the pertinent patents and trademarks. Id. at Appendix A, Appendix B.

------------ End Footnotes---------
------

[*9]

In return for this exclusive right, Flakt agreed to make certain payments to Dan-Web. First, a "technology fee payment of $ 275,000 (U.S. dollars) due and payable upon execution of this agreement." Id. at § 5(1)(A). Second, Flakt would pay Dan-Web advance royalty fees which would total $ 275,000. Of the royalty sum, $ 25,000 was due upon execution of the agreement; $ 125,000 was due in three months; and the final $ 125,000 was due in six months. Id. at § 5(1)(B)(i). Third, Flakt agreed to pay a 3% commission on the net sales price of any product sold under the agreement. In the absence of any actual sales, the agreement imposes a "Cumulative Minimum Royalty Obligation" upon Flakt. Under this "Obligation", Flakt was to pay Dan-Web $ 225,000 on June 15, 1991 and an additional $ 225,000 on June 15, 1992. Further, future payments were also imposed. Id. at § 5(2).

At some point late in 1989 or early in 1990, plaintiff Conley began an association with UPM which has raised concerns about potential violations of the Settlement Agreement's covenant not to compete. In a letter dated March 6, 1990, Conley informed defendant Mosgaard that he had "completed a U.S. market [*10] survey as an independent consultant for UPM." D.I. 61 at Tab 14; D.I.64 at AA. Later, on June 15, 1990, plaintiff Conley and Walkisoft USA, a wholly owned subsidiary of UPM, signed an employment contract which made Conley "Managing Director" of Walkisoft USA. D.I. 61 at Tab 21, § 3. The contract also stated that Walkisoft "will engage in the manufacture and sale of Walkisoft Absorbent/Disposable Materials and End Products in a variety of forms . . . ." Id. at the "Recitals". n4

------------- Footnotes ---------
------

n4 Walkisoft's Certificate of Incorporation states broader purposes, including "to do every other act or acts, thing or things, incidental to or growing out of or connected with" the manufacture of paper, as well as "to engage in, promote, conduct and carry on any lawful acts . . . ." D.I. 61 at Tab 36.

------------ End Footnotes---------
------

The second major transaction occurred just two months later. On November 7, 1989, Dan-Web signed an agreement with United Paper Mills, Ltd. ("UPM"), a Finnish corporation ("UPM Agreement"). D.I. 61 at

Page 5

Tab 7. The agreement granted [*11] to UPM "an option . . . to obtain a limited non-exclusive license to deliver, build, install and operate one (1) latex-bonded dry forming production line in the USA." Id. at Art. I, § 1.01. n5 UPM agreed to pay Dan-Web $ 500,000 for this option. Id. at Art. II, § 2.01. In order to exercise the option, UPM was required to pay an additional $ 500,000 on or before November 30, 1990. at Art. I, § 1.02; Art. II, § 2.02. While it is clear that by September 4, 1990, UPM had exercised its option, it is not clear precisely when UPM acted.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n5 Over a year later, on December 17, 1990, in a letter to plaintiff Conley, defendant Mosgaard stated, "Dan-Web has granted UPM a licensing agreement for certain machines to be sold in Europe and one in the U.S." D.I. 61 at Tab 34. Plaintiffs cite this letter as evidence that the license was in fact a license to sell. D.I. 67 at 39.

- - - - - - - - - - - End Footnotes- - - - - - - - - - -

On September 4, 1990, UPM fulfilled its obligations under its option agreement with Dan-Web, informing Dan-Web that it "hereby exercises its option [*12] to deliver, build, install and operate a production line in the USA as provided in said Option Agreement." D.I. 61 at Tab 8. According to the same letter, as of September 4, 1990, a total of one million United States dollars had been paid to Dan-Web. Id.

On June 25, 1990, UPM sold a dry forming paper machine to Walkisoft in the third major transaction at issue. D.I. 61 at Tab 13. The sale price, as reflected in the sales contract between UPM and Walkisoft, was nine million United States dollars. D.I. 61 at Tab 13, § 2. Plaintiff Conley signed the sales contract on behalf of Walkisoft. Id. at 15.

In an exchange of correspondence between the parties subsequent to the Walkisoft sale, defendant Dan-Web, in a September 6, 1990, letter signed by defendant Mosgaard, inquired as to plaintiff Conley's participation with various companies. D.I. 61 at Tab 15. Conley responded on October 1, 1990, to explain his affiliations. D.I. 61 at Tab 30. Conley also mentioned the sale by UPM to Walkisoft. He explained, "I am now an employee of Walkisoft USA Inc. which is in the business of making and selling air formed web. I am not aware of Walkisoft USA, or UPM for that matter, [*13] selling a line of competitive equipment in the territory. On the contrary, Walkisoft has purchased a DW/FLAKT machine for the US [sic] and by all indications appears to be an excellent future customer . . . ." Id. (emphasis in the original). n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n6 Despite having signed the sales contract and thereafter notifying Dan-Web of the sale in his October 1 letter, Conley wrote Dan-Web on November 15, 1990, that "it has come to my attention, mainly through widely circulated press releases, that Dan Web has effected the Sale (as defined in the Agreement) of a dry forming paper machine to United Paper Mills (UPM) for use in its new plant in North Carolina." D.I. 61 at Tab 35.

- - - - - - - - - - - End Footnotes- - - - - - - - - - -

## C. Facts Relating to Reporting Requirements

Following consummation of the Settlement Agreement, the parties exchanged communications with respect to the reporting requirements contained in the Agreement. Two distinct reports were required. First, Dan-Web had to send Poland and Conley reports pertaining to specific sales. [*14] D.I. 47 at A, § 4(d)(i). Second, more general reports were to be sent twice a year. Id. at § 4(e). The record does not reflect any correspondence specifically addressed to the reports on individual sales.

Pursuant to its obligations to supply the more general reports under section 4(e), Dan-Web had agreed to report sales and proceeds from service contracts exceeding $ 100,000, as well as the "consolidated net income and cash flow of [Dan-Web], SWNA, and any DW Seller . . . ." n7 Such reports were to be certified by a chartered accountant and the chief financial officer of Dan-Web. The Settlement Agreement was signed on April 21, 1989. The first section 4(e) report was due on January 31, 1990. n8 The second report was due July 31, 1990, and the third report was due January 31, 1991. Suit was filed on July 12, 1991, arguable obviating the need for additional reports.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n7 Section 4(e) reads, in its entirety:

DW [Dan-Web] shall furnish Sellers [plaintiffs], within thirty (30) days of January 1 and July 1 of each year during

Page 6

the Payment Period, with a statement certified by each of the chartered accountants and chief financial officer of DW of (i) all Sales made and all Sales Proceeds received by any DW Seller related to the Territory and all payments to Sellers during the preceding six months, and (ii) the consolidated net income and cash flow of DW, SWNA, and any DW Seller as to which Purchasers, DW or SWNA have access to financial statements.

D.I. 47 at A, § 4(e). The Settlement Agreement defines "Sales Proceeds" as the "the Sales Proceeds as reflected on the face of the Purchase Contract as sent by the Customer to, or otherwise received by, the DW Seller after deducting shipping costs and duties paid by the DW Seller." Id. at § 4(c). While the Settlement Agreement includes the value of securities which may be paid to the Seller, it goes on to state, "Sales Proceeds shall not include payments by a Customer to a DW Seller solely for services with an aggregate value of less than $ 100,000, provided, however, that in the event the aggregate value of services provided by a DW Seller exceeds $ 100,000, Payments shall be calculated on the entire amount of the Sales Proceeds." Id. By these terms, service contracts for less than $ 100,000 did not need to be reported.

[*15]

------------ Footnotes ---------

n8 Technically, the first report could have been due on July 1, 1989. The absence of such a report has not been raised as an issue by the parties.

------------ End Footnotes---------

### 1. The First Report: Due 1/31/90

The reporting correspondence began with a letter from Dan-Web on January 31, 1990, to plaintiff Poland. D.I. 61 at Tab 11. The letter asked that it be accepted "in lieu of the more formal certification requirement required by paragraph 4(e) of the Agreement . . . ." Id. It notified plaintiffs of the Flakt license and of Dan-Web's intent to dissolve SWNA, and it inquired as to plaintiff Poland's affiliation with UPM. This letter contained no certification provision, and did not mention the payments due from Flakt under the fee schedule.

Plaintiff Conley responded to this letter on March 6, 1990. D.I. 64 at X. n9 In the letter, Conley wrote,

Both Clark and I feel that the Certification regarding sales in the Territory should be done in accordance with Our Agreement. This does not have to be a lengthy document, a single page will probably do - - however it a) should confirm what, if any, sales and/or [*16] services in accordance with the Agreement have been made and b) should be certified by both DW's chartered Accountant and the Chief Financial Officer of DW.

Id.

------------ Footnotes ---------

n9 An identical letter was apparently sent again in April and marked "SECOND NOTICE April 23, 1990." D.I. 61 at Tab 24.

------------ End Footnotes---------

In response to Conley's letter, Dan-Web produced a second letter, dated April 27, 1990, which recited the arrangement with Flakt, again omitting the fees Flakt was to pay to Dan-Web. D.I. 61 at Tab 12. The letter of April 27 contained a certification clause and two signatures identified as the Chartered Accountant and the Chief Financial Officer. Id.

### 2. The second Report: Due 7/31/90

The first letter with respect to the second report came on September 4, 1990, from Conley. D.I. 61 at Tab 26. It requested compliance with the Settlement Agreement's reporting requirements. Id. In requesting this compliance, Conley expressly quoted the Settlement Agreement. Id.

Perhaps crossing in the mails, defendant Dan-Web [*17] sent a letter, dated September 6, 1990, to plaintiffs informing them that certain equipment had been sold into the Territory. The letter went on to state that Dan-Web was withholding the pertinent information and payments until plaintiff Conley made his association with certain companies known to defendants. D.I. 61 at Tab 15. Defendant Dan-Web expressed concern that Conley may be violating the "Non-compete Covenant" of section eight in the Settlement Agreement.

On October 1, 1990, Conley responded to Dan-Web's letter of September 6. D.I. 61 at Tab 30. Conley explained his affiliation, or lack of affiliation, with the companies about which Dan-Web had expressed

concern. Conley also informed Dan-Web of his employment at Walkisoft. Id. n10

------------- Footnotes ---------
------

n10 This letter, as mentioned above, also explained Conley's view of the UPM-Walkisoft sale. See supra, at 9.

------------ End Footnotes--------
------

Referring to an "initial explanation" from Conley, defendant Dan-Web issued a report dated September 24, 1990. D.I. 61 at Tab 17, Tab 28. n11 The report [*18] recited total sales receipt from the territory of $ 137,500 and apparently included payments of 1.5% to each Poland and Conley. Id. In the statement, Dan-Web again expressed concern about Conley's activities, and expressly reserved the right not to pay further commissions to Conley unless he confirmed the absence of any violation of the "Non-compete Covenant". Id. This letter contained no certification provision. No separate report as required by § 4(d)(i) appears in the record with regard to this sale.

------------- Footnotes ---------
------

n11 This letter appears to have been written before Conley wrote his explanation, dated October 1, 1990. D.I. 61 at Tab 30.

------------ End Footnotes--------
------

In response to Dan-Web's report of September 24, 1990, both plaintiffs subsequently wrote to Dan-Web to point out the lack of compliance with the Settlement Agreement. D.I. 61 at Tab 29 (Poland, dated 10/9/90); Tab 35 (Conley, dated 11/15/90). Responding to plaintiff Conley's letter, Dan-Web wrote a comparatively lengthy letter, declaring plaintiff Conley to be in breach of the [*19] no-compete clause of the Agreement. D.I. 61 at Tab 34 (dated 12/17/90).

### 3. The Third Report: Due 1/31/91

In a letter dated January 9, 1991, Dan-Web reported no sales had been made. D.I. 61 at Tab 31. Dan-Web explained that it was withholding any other required information due to "the continuing breach of Mr. Conley and for reasons previously set forth." Id. Dan-Web stated it would allow plaintiff Poland access to the information, if he so requested. Id. The letter contained a certification provision and the signature of an individual identified as the Chartered Accountant and Chief Financial Officer. Id.

On February 1, 1991, plaintiff Poland again wrote to Dan-Web to complain about the lack of compliance. D.I. 61 at Tab 33. In response, Dan-Web reiterated its position with regard to Conley's activities, expressed concern for the information's confidentiality and informed plaintiff Poland that, pursuant to section 4(f) of the Settlement Agreement, he could inspect the appropriate records in Dan-Web's offices in Arhus, Denmark.

### D. Facts Relating to Defendants' claim of Fraud

Defendants have placed into the record various documents which pertain [*20] to the conduct of the plaintiffs before the Settlement Agreement had been reached in 1989. Certain pieces of the correspondence reflect exchanges plaintiffs Poland and Conley had with UPM. D.I. 64 at CC, FF; D.I. 25 at C, D, E. The record also includes a series of telexes between plaintiff Poland and UPM which, apparently arranged for Poland to visit UPM in Finland sometime in August of 1984. D.I. 64 at GG; D.I. 25 at B. At least one document indicates alleged surreptitious conduct involving a sample of paper being made behind the back of defendant Mosgaard at the request of plaintiff Poland. D.I. 64 at BB.

## II. Summary Judgment

The parties have filed cross motions for summary judgment on part of plaintiffs' first count and on all of count three. Defendants have also filed for summary judgment to preclude individual liability as to Kongsted and Mosgaard. In addition, plaintiffs have filed for summary judgment on all counts of their complaint and on all of the defendants' counterclaims.

[HN1]Rule 56 of the Federal Rules of Civil Procedure requires the Court to enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together [*21] with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id.

[HN2]Applied specifically to contract disputes, if the moving party presents the only reasonable

Page 8

interpretation of the contract's language, and the pertinent facts are not in dispute, the Court will enter summary judgment. On the other hand, "if the non-moving party presents . . . a reasonable reading of the contract . . . then a question of fact exists which can only be resolved at trial." Landtect Corp. v. State Mut. Life Assurance Co. Etc., 605 F.2d 75, 79 (3rd. Cir. 1979), quoted in Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3rd Cir. 1987). [*22]

If the contract language admits of only one interpretation, factual questions may arise as to whether the parties have fulfilled their obligations under the contract. In seeking to resolve these issues and factual issues unrelated to the terms of the contract, the Court must apply the applicable standards for summary judgment. On such issues, the non-moving party must have placed in the record sufficient evidence for the Court to find a genuine issue of material fact.

[HN3]
The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case; and on which that party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

It is not enough for the non-moving party to have provided a scintilla of evidence supporting its position. Anderson v. Liberty Lobby, Inc., 477 U.S. at 252. The Court will enter summary judgment if "the nonmoving party has failed to make a sufficient showing on an essential element [*23] of her case with respect to which she has the burden of proof." Celotex, 477 U.S. at 323.

[HN4]It is not the Court's task to replace the trier of fact and to resolve questions about which genuine factual issues exist. The Court will only enter summary judgment if no rational trier of fact could weigh the evidence and find for the nonmoving party. "At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

Because this case is based upon diversity jurisdiction, the Court will apply the law of Delaware, including Delaware's choice of law provisions. A.I.C. Ltd. v. Mapco Petroleum Inc., 711 F. Supp. 1230, 1237 (D. Del. 1989). Delaware's choice of law provisions recognize parties' agreements to have disputes governed by Delaware law. Del. Code Ann. tit. 6, § 1-105(1) (1991). The parties contractually determined to have Delaware law govern their 1989 Settlement Agreement. D.I. 47 at A, § 12. Accordingly, the Court will abide by their decision [*24] and apply Delaware law in construing the contract in question. A.I.C. Ltd., 711 F. Supp. at 1237.

### III. Preliminary Consideration

Before ascertaining whether the Settlement Agreement was breached, the Court must preliminarily treat contentions revolving around an exclusion from liability, the effect of a release and a defense of rescission. Plaintiffs seek to hold Mosgaard and Kongsted personally responsible for any commissions due under the Agreement. Defendants, relying upon the language of the Settlement Agreement, have moved for summary judgment to preclude any personal liability of Mosgaard and Kongsted as to any commissions which may be due. In addition, defendants seek to have the Settlement Agreement rescinded by the Court due to the alleged behavior of the plaintiffs at the time of, and in the time before, the 1989 Settlement Agreement was signed. Plaintiffs seek summary judgment on defendants' claim for rescission.

### A. Individual Liability of Mosgaard and Kongsted

With respect to the individual liability of defendants Mosgaard and Kongsted for any commissions, section ten, paragraph (b) of the Settlement Agreement reads, "This [*25] Agreement constitutes the valid, binding and enforceable obligation of each DW, SWNA, Scan-web I/S, HK [Kongsted] and JM [Mosgaard] (except as to individual liability of HK and JM as to Payments)." D.I. 47 at A, § 10(b) (emphasis added). n12 A plain reading of this language seemingly militates against holding defendants Mosgaard and Kongsted liable for any payments due as commissions.

---------------- Footnotes ---------------

n12 "Payments" refers to the commissions due under section four. D.I. 47 at A, § 4(b).

------------- End Footnotes--------------

Plaintiffs here attempted to avoid this Settlement Agreement language in two ways. First, in their complaint they name Mosgaard and Kongsted as "affiliates" of Dan-Web rather than naming them as signatories to the Settlement Agreement, D.I. 1 at P 51, presumably hoping to establish individual liability by reason of section four, paragraph (b) of the Settlement Agreement. In general, section four is the section which determines when commissions will come due. As to which parties will be liable for those

Page 9

commissions, section four states, "each [*26] of DW, SWNA, and, as to each of them, their affiliates and associates . . . shall be jointly and severally responsible and liable for the payment in full . . . ." D.I. 47 at A, § 4(b). n13 Assuming defendants Mosgaard and Kongsted qualify under the Agreement's definition of "affiliate", plaintiffs urge this provision of section four makes Mosgaard and Kongsted liable, despite section ten's exclusion of their liability.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n13 The Settlement Agreement later defines "Affiliate" as:

any Person (i) which directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with, the Person or (ii) five percent (5%) or more of the voting stock (or in the case of a Person which is not a corporation, five Percent (5%) or more of the equity interest) of which is beneficially owned or held, directly or indirectly by the Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting capital stock, by contract or otherwise.

D.I. 47 at A, § 14(1).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*27]

The liability provision in section four, however, is a broad, general assignment of liability, and the exclusionary language in section ten is a narrow, specific clause. [HN5]It is a basic tenet of contract construction that where a contract contains inconsistent terms, the specific term qualifies the general. Stasch v. Underwater Works, Inc., 158 A.2d 809, 812 (Del. Super. Ct. 1960); New Castle-Gunning Bedford Educ. Assoc. v. Board of Educ. of the New Castle-Gunning Bedford School District, 421 F. Supp. 960, 964 (D.Del. 1976); Restatement (Second) of Contracts, § 203(c) (1981). The specific provision of section ten paragraph (b) of the Settlement Agreement qualifies the general liability provision of section four, paragraph (b).

Moreover, if the Court allowed plaintiffs to sue Mosgaard and Kongsted as "affiliates", it would render the exception from liability of section 10(b) meaningless. [HN6]Under Delaware law, the Court should seek a construction "that will give full force and effect to all of the provisions of the agreement . . . ." Radio Corp. of America v. Philadelphia Storage Battery Co., 6 A.2d 329, 334 (Del. 1939); [*28] E.I. du Pont de Nemours v. Shell Oil Co., 498 A.2d 1108, 1113 (Del. 1985). Under this rule of construction, effect must be given to the language in section 10, paragraph (b), pursuant to which plaintiffs agreed defendants Mosgaard and Kongsted would not be personally liable for payment of any commissions.

Plaintiffs base a second argument on certain Delaware statutes which provide for the continuing liability of directors of a Delaware corporation upon dissolution. D.I. 54 at 37, n.20. The statutes and the case cited by plaintiffs provide for liability of stockholders and directors for a three year period after the dissolution of a corporation in order for the corporation to wind up its affairs. Del. Code Ann. tit. 8, §§ 278, 282 (1991); Gans v. MDR Liquidation Corporation, C.A. No. 9630, slip op. at 22 (Del. Ch. Jan. 10, 1990) ("once [the corporation] was dissolved, fiduciary obligations were imposed on its director defendants not only to the former stockholders of the corporation, but also to the creditors of the corporation.") (citing Del. Code Ann. tit. 8, § 278 (1991)). Plaintiffs argue the Delaware corporation code mandates that defendants [*29] Mosgaard and Kongsted be held liable as directors of SWNA, a dissolved Delaware corporation.

The short answer to plaintiffs' argument is that their complaint nowhere asserts any liability of Mosgaard and Kongsted arising pursuant to the dissolution of SWNA. Defendants' motion for summary judgment on the issue of the individual liability of Mosgaard and Kongsted for payments under the Settlement Agreement will be granted.

## B. Rescission

In count I of their counterclaim, defendants have alleged that the plaintiffs had "perpetrated a fraud" upon defendants when the Settlement Agreement was signed and that this alleged fraud entitles defendants to rescission. D.I. 4 at P 19, 20 of the Counterclaims. Plaintiffs seek summary judgment on defendants' asserted right to rescission.

The defendants allege fraud under the Settlement Agreement on two separate bases. First, defendants assert that after the Settlement Agreement was signed, "defendants/ counterclaimants have discovered various acts and deeds of Poland and Conley unknown at the time of settlement, which acts and deeds and omissions were in violation of the May 1, 1981, licensing agreement between Dan-Web and Scan-Web, [*30]

Page 10