as well as the shareholder agreement." D.I. 4 at P 13 of the Counterclaims. Because of these "acts and deeds", defendants allege plaintiffs committed fraud when they assured defendants in the Agreement that no event had, or was, occurring "which constitutes an event of default or which would constitute an event of default . . . ." D.I. 47 at A, § 11(e) quoted in D.I. 4 at P 15 of the Counterclaims.

Defendants' second allegation of fraud arises from section eleven of the Settlement Agreement in which the plaintiffs agreed to hand over to defendants all documents relating to SWNA. Despite this promise, defendants allege, "documents relating to recent months were completely absent, including documents presumably once in existence because of a reference to them in other documents." Id.

As to the first alleged basis of fraud, section six of the Settlement Agreement provides:

> DW [Dan-Web] (and [its] officers, directors, employees and agents) hereby release Sellers [Poland and Conley] from any and all claims which . . . DW . . . may have against Sellers, including without limitation all claims with respect to the Distribution Agreement and the Stockholders Agreement, but [*31] excluding any claims with respect to obligations of the Parties under this Agreement.

D.I. 47 at A, § 6(b). n14

---- Footnotes ----

n14 The previous paragraph of the Settlement Agreement defines the "Distribution Agreement" as the agreement dated the first of May, 1981, between Dan-Web, SWNA, and Scan-Web I/S. D.I. 47 at A, § 6(a).

---- End Footnotes ----

This issue involves the application of releases from liability which the parties have signed and which Delaware law recognizes. Chakov v. Outboard Marine Corp., 429 A.2d 984, 985 (Del. 1981). [HN7]Once executed and delivered, "an effective release terminates the rights of the party executing and delivering the release and an effective release is a bar to recovery on the claim released." Hicks v. Sakora 188 A.2d 133, 138 (Del. Super. Ct. 1963). In both instances, the Court must begin by looking to the language of the release as provided in the Agreement. Chakov, 429 A.2d at 985. If the language clearly establishes [*32] a release from liability, "the presumption is that the parties executing such a formal agreement intended what they said." Hob Tea Room v. Miller, 89 A.2d 851, 856 (Del. Super. Ct. 1952).

Defendants have not overcome the presumption. Section six of the Settlement Agreement expressly releases plaintiffs from any claims based either on the 1981 Agreement or the Stockholders Agreement. The claims which defendants have advanced are based upon the 1981 Agreement and the Stockholders Agreement. If the Court were to allow the defendants to proceed, "the language of the release would be rendered next to meaningless." Clum v. Daisy Concrete, 578 A.2d 684, 685 (Del. Super. Ct. 1989).

The second allegation of fraud does not relate to behavior occurring before the 1989 Agreement, and therefore the Release Provision of section six does not apply. Instead, the defendants have alleged fraud in the plaintiffs' assurances in the 1989 Agreement because "Documents relating to recent months were completely absent, including documents presumably once in existence because of a reference to them in other documents." D.I. 4 at P 13.

This [*33] allegation, if true, would violate section eleven, paragraph (f) of the 1989 Agreement. This provision states that plaintiffs Poland and Conley "have provided to purchasers at closing all documents, Customer lists, proprietary information or other property acquired by [plaintiffs] in connection with their service as directors and officers and shareholders of SWNA." D.I. 47 at A, § 11(f). The defendants seek rescission of the entire Settlement Agreement based upon the alleged violation of section 11(f).

[HN8]The elements of a claim for rescission are: (1) a misrepresentation occurred; (2) the misrepresentation was fraudulent or material; (3) the party with the claim was induced into the contract by the misrepresentation; (4) the party so induced was reasonable in relying upon the misrepresentation. Alabi v. DHL Airways, Inc., 583 A.2d 1358, 1361-62 (Del. Super. Ct. 1990) (referring to elements as presented in the Restatement (Second) of contracts § 164). See also Norton v. Poplos, 443 A.2d 1, 4-5 (Del. 1982).

As to the first element, the defendants assert that a misrepresentation occurred when the plaintiffs assured the [*34] defendants all the pertinent documents were present when, in fact, they were not. The defendants have not, however, compiled a clear record to indicate which documents were missing. Nor have the defendants specifically indicated which documents in the record, if any, make reference to absent documents.

The documents to which defendants generally refer in their reply brief may be divided into two groups - documents dated before the 1989 Agreement and

documents dated after the 1989 Agreement. Among the documents dated after the 1989 Agreement, there is no mention of missing documents, or reference to documents which are absent. n15 In the documents to which defendants refer and which were dated before 1989, an occasional reference has been made to documents which have not been included in the record. For instance, in a telex sent by plaintiff Poland to UPM on May 15, 1985, Poland states, "Please refer to my letter to Mr. Pehu-Lehtonen dated April 11, 1985 . . . ." D.I. 25 at C. n16 From these vague references, it is not clear whether these were the allegedly missing documents.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n15 On at least two occasions, the documents refer to an outside source of information, but that source is not identified as a document. First, in a letter from Dan-Web on September 24, 1990, defendants state:

With regard to Mr. Conley, we have previously asked for confirmation that he is not an employee or otherwise affiliated with UPM or another competitor of Dan-Web, pursuant to the Agreement. Following our receipt of Mr. Conley's initial explanation, we have learned that he has attended meetings and engaged in other activities which we understand to be on behalf of UPM.

D.I. 61 at 17, 28 (emphasis added). While it is unclear from where the defendants had learned this new information, it does not appear to be from any documents which may have been absent in the 1989 transaction.

Second, similar references occurred in Dan-Web's letter of December 17, 1990. Again in regard to Conley's activities, the defendants remarked, "facts came to our attention . . ." and "we had learned . . . ." D.I. 61 at 34. These references by defendants to outside sources of information could theoretically have been references to information gathered from newly found pre-existing documents, but because the activities occurred after 1989, that conclusion is unlikely.

[*35]

n16 Another example later in the same stream of telex exchanges occurred on April 25, 1985, with a reference to "a request from an international company headquartered here . . . ." D.I. 25 at C.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Plaintiffs cite defendant Mosgaard's deposition as the only reference to the missing documents. D.I. 54 at 42. In that testimony, defendant Mosgaard remarks,

If you look at the different files we got as part of the settlement from these gentlemen, there are papers up to almost through the settlement date. Sometimes in '89 except from the UPM file. It ended in '86. And the letter I'm referring to, which should have been in that file - - I mean, we keep copies in our files all the letters we are sending out. It is dated in, as I said, late December, '90. So why was it not part of the documents we got from the two gentlemen as part of the documentation with the company?

D.I. 59 at 113-114. While this testimony does directly support the defendants' contention, it lacks both specificity and clarity. Indeed, the apparently absent letter was dated in December of 1990, or approximately eighteen [*36] months after the Settlement Agreement was concluded.

This evidence has to be considered in light of [HN9]the rule which requires summary judgment if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex, 477 U.S. at 223. This standard does not prevent the entry of summary judgment simply because some showing has been made with regard to an essential element. The standard instead requires "a sufficient showing on an essential element". Applied to the claim for rescission, the defendants must make "a sufficient showing" that the plaintiffs misrepresented the situation in assuring the defendants of the presence of all documents.

The evidence presented in the record does not rise to the level of a sufficient showing. Defendants have only referred generally to exchanges of correspondence. An examination of the correspondence shows scant references to any external documents. Furthermore, of the external documents to which there are references, none have been identified as absent at the closing of the 1989 Agreement. The Court has not been told whether these [*37] references are to missing documents, or whether these are

Page 12

references to documents which have been left out of the record for other reasons. Finally, defendant Mosgaard's deposition does allege missing documents, but the allegations reference documents dated after the close of the 1989 Agreement and lack the specificity and clarity to be considered "sufficient" for purposes of summary judgment. Because the evidence presented in the record presents only vague allusions to documents purportedly absent, defendants have failed to make the "sufficient showing" required to defeat the motion for summary judgment sought by the plaintiffs.

Because defendants' first allegation of fraud is precluded by the release which they signed, and because the support for the second allegation of fraud is insufficient for any rational trier of fact to find plaintiffs had committed fraud, plaintiffs' motion for summary judgment on defendants' first counterclaim will be granted.

## IV. Breach of Contract Claims

Turning to the first of the plaintiffs' claims, upon which they seek summary judgment, the issues primarily involve the interpretation of the 1989 Settlement Agreement.

[HN10]In interpreting [*38] a contract, "the language of the Agreement must . . . be the starting point." Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del. 1992). This is so because, as an initial matter, courts must seek the intent of the parties and "the intent of the parties must be ascertained from the language of the contract." Id.

When examining the language of the contract, it has long been held in Delaware that if "the language of the contract is not in any sense ambiguous, its meaning is ordinarily a question of law for the court to ascertain from the instrument itself . . . ." Colvocoresses v. W.S. Wasserman Co., 190 A. 607, 612 (Del. Super. Ct. 1937); Pellaton v. Bank of New York, 592 A.2d 473, 478 (Del. 1991). As the Delaware Supreme Court recently found,

When there is uncertainty in the meaning and application of the contract, this Court, and the trial court, will consider testimony pertaining to antecedent agreements, communications and other factors which bear on the language of the contract. However, if the instrument is clear and unambiguous on its face, neither this Court nor the trial [*39] court may consider parol evidence 'to interpret it or search for the parties intent[ions]'
. . . .

Pellaton, 592 A.2d at 478 (citations omitted). See also Restatement (Second) of Contracts, § 212.

[HN11]At the summary judgment stage, this Court will only enter summary judgment if the moving party has presented the only reasonable reading of the contract terms at issue, or if the record lacks adequate support for the non-moving party's position. If the contract proves susceptible to more than one reasonable reading, or the nonmovant has "made a sufficient showing" as to any issue, summary judgment will be denied.

### A. Applicability of the Settlement Agreement

The first count of plaintiffs' complaint asserts that the defendants have breached the Settlement Agreement by not paying commissions to the plaintiffs. Section four of the Settlement Agreement contains provisions governing when a commission would be due to the plaintiffs. n17

---------- Footnotes ----------

N17 Section four is entitled "Payments for Restrictive Covenants". Dkt. 47 at A. Commission are owed to the plaintiffs as consideration for not competing against the defendants. See infra 51-52.

---------- End Footnotes ----------

[*40]

Section four applies to two types of transactions. Under the language of section four which defines "Sale" and which applies when a "Sale" has been made "of any products to any Person (a 'Customer') in the Territory by . . . " certain parties, four conditions must be met.

First, there must have been a transaction which qualifies as a "Sale". The term "Sale" includes "distribution, lease, transfer, consignment, assembly, use or license of, or the provision of any services . . . ." D.I. 47 at A, § 4(a). This portion of the agreement applies on its terms only to transactions involving two parties.

Second, the "Sale" must have been made by certain parties. Under the agreement these parties include:

Purchasers, DW, SWNA or Scan-web I/S, any direct or indirect subsidiary, affiliate, associate, or stockholder of DW or SWNA, any person or entity controlling, controlled by, or under common control with, DW or SWNA, or any sub-supplier, or other person operating under a license, release assignment or other

arrangement with DW, SWNA, Scan-web I/S or a DW Seller (as hereinafter sometimes called, collectively, a 'DW Seller').

Id. n18

------------- Footnotes ---------------

n18 The term "Purchasers" refers to defendants John Mosgaard and Helge Kongsted. D.I. 47 at A, the Recitals.

------------ End Footnotes---------------

[*41]

Third, the "Sale" by a "DW Seller" must have been made to a "Customer". In terms of who may qualify as a "Customer", the agreement states only that the transaction in question must be made "to any Person (a 'Customer') in the Territory". Id. The agreement later indicates that the term "Person" is not limited to natural beings. Id. at § 14(k). The "Territory" is defined as "the United States, Canada, and/or Mexico". Id. at § 4(b).

Fourth, the transaction must have involved a "Product". The term "Product" includes "technology, systems, processes, machinery, equipment, products, components and services related thereto, of DW, SWNA, Scan-web I/S, or a DW Seller used in the dry forming of fibers, and any improvements or modifications thereof and new developments in connection therewith." Id.

These definitions apply as well to three party transactions. The Settlement Agreement has a separate provision governing three party resales by a buyer to a third entity. The Settlement Agreement's Resale Provision provides, "The term 'Sale' shall also include the Sale of any Products to a Customer whose principal place of business is outside the Territory, if, thereafter, [*42] during the Payment Period such Customer Sells the Products in the Territory." Id. at § 4(a).

The Resale Provision does not look only to the presence of a "Product", a "DW Seller", a "Customer" and a "Sale" - the four elements named above. The Resale Provision applies when two transactions have occurred. In the initial transaction, the Provision still requires a "DW Seller" to make a "Sale" of "any Products". The Provision alters the definition of "Customer" by applying to "a Customer whose principal place of business is outside the Territory". In the second transaction, the Provision requires the "Customer" in question to make another "Sale" of "the Product" into the "Territory". In sum, under the Resale Provision, the initial sale need not be to a Customer in the Territory and, in the second transaction, a "DW Seller", as previously defined, does not need to be involved.

### 1. Flakt Agreement

Plaintiffs have moved for summary judgment with respect to any commissions due to them under the Settlement Agreement because of the Flakt Agreement. The four elements discussed above are all present. A "DW Seller", Dan-Web, made a "Sale", the license, of a "Product", the [*43] technology, to a "Person", Flakt, in the "Territory", the United States. Defendants do not dispute the terms of the Flakt Agreement, nor do they dispute that it appears to fall within the terms of the Settlement Agreement.

Defendants instead argue that neither party meant for the Flakt Agreement to be covered by the Settlement Agreement when the Settlement Agreement was signed. Moreover, defendants argue, the absence of any previous protest by plaintiffs confirms this understanding. D.I. 63 at 46-48.

If, as defendants argue, the parties understood or intended the Flakt Agreement to be an exception to these provisions, no such intention or understanding is reflected in the terms of the contract. The broad language of these contracts contains no ambiguous language on this point. Rather, defendants ask the Court to add to the Settlement Agreement an additional provision which would exempt the Flakt Agreement from the otherwise express terms of the Agreement. When the terms of a contract are clear, "a court may not, in the guise of construing a contract, in effect rewrite it to supply an omission in its provisions." Conner v. Phoenix Steel Corporation, 249 A.2d 866, 868 (Del. 1969). [*44] "If the instrument is clear and unambiguous on its face, neither this Court nor the trial court may consider parol evidence 'to interpret it or search for the parties intent[ions]' . . . ." Pellaton, 592 A.2d at 478 (citations omitted). For this reason, summary judgment will be entered for the plaintiffs on the first component of their first count. n19

------------- Footnotes ---------------

n19 The Court is unwilling on the present record to determine the amount of damages due under the Settlement Agreement because of the Flakt License. Precisely how much money has been paid to Dan-Web by Flakt is unclear. D.I. 64 at Tab P, 79-80. Section four (c) of the Settlement Agreement does not state with clarity whether the commission should be based on the contract price or the actual amount received. Section four (c) refers to

Page 14

proceeds "as reflected on the face of the Purchase Contract as sent by the Customer to, or otherwise received by, the DW Seller after deducting shipping costs and duties paid by the DW Seller. . . ." D.I. 47 at A, § 4(c).

------------ End Footnotes--------------

[*45]

## 2. UPM Agreement

Plaintiffs have also moved for summary judgment for any commissions due to them as a result of two related transactions involving Dan-Web, UPM, and Walkisoft. Plaintiffs have claimed commissions on both the initial transaction with UPM and the subsequent transaction between UPM and Walkisoft.

In the initial agreement between Dan-Web and UPM, Dan-Web granted UPM "an option . . . to obtain a limited non-exclusive license to deliver, build, install and operate one (1) latex-bonded dry forming production line in the USA." D.I. 61 at 7, Art. I, § 1.01. UPM agreed to pay Dan-Web $ 500,000 for this option. Id. at Art. II, § 2.01. n20 In order to exercise the option, UPM paid an additional $ 500,000. D.I. 61 at Tab 8.

--------------- Footnotes ----------

n20 All currency figures represent United States dollars.

------------ End Footnotes--------------

In the second transaction, on June 25, 1990, UPM sold a dry forming paper machine to Walkisoft, a wholly owned UPM subsidiary which operates in the United States. The sale price, as reflected in the sale contract [*46] between UPM and Walkisoft, was nine million United States dollars. D.I. 47 at C, § 2.

To address first the initial transaction with UPM, plaintiffs argue that a commission became due on this transaction when defendants licensed UPM "to deliver, build, install and operate one (1) latex-bonded dry forming production line in the USA." D.I. 67 at 7, Art. I, § 1.01. In this Option Agreement, three of the elements required for a commission are present. A "DW Seller", Dan-Web, made a "Sale", the license, of a "Product", the Dan-Web technology. As plaintiffs point out, the Settlement Agreement's definition of "Sale" explicitly includes "license of". D.I. 54 at 27.

However, the fourth criteria is not met. UPM does not qualify as a "Customer". The Settlement Agreement requires the transaction to involve "any Products to any Person ('Customer') in the Territory." UPM is a Finnish company and on the present record was not "in the Territory" when it was licensed. The plain language of section four of the Settlement Agreement, applicable to a two party transaction, requires that transaction to involve "any Person ('Customer') in the Territory". At the time of the option agreement, and [*47] apparently at all times, UPM has not been "in the Territory". Because UPM was not in the Territory, it is not a customer under the Agreement and plaintiffs' motion for summary judgment as to a commission based upon the UPM Agreement will be denied.

## 3. The UPM-Walkisoft Transaction

With respect to the subsequent sale by UPM to Walkisoft, two of the prerequisites for a commission have clearly been met. A "Customer", Walkisoft, operating in the United States, made a purchase qualifying as a "Sale", here an actual sale. The two remaining elements require the sale to have been made by a "DW Seller" and to involve a "product."

### a. "Product"

The Settlement Agreement broadly defines "Product" to include "technology, systems, processes, machinery, equipment, products, components and services related thereto, of DW, SWNA, Scan-web I/S, or a DW Seller used in the dry forming of fibers, and any improvements or modifications thereof and new developments in connection therewith." D.I. 47 at A, § 4(b). For purposes relevant to the Walkisoft transaction, "Product" would include "technology . . . processes . . . [or] components . . . of DW . . . or a DW Seller . . . used in [*48] the dry forming of fibers . . . ." Id.

In their complaint plaintiffs allege "UPM sold to Walkisoft USA a dry-forming paper manufacturing machine based on Dan-Web technology". D.I. 1 at P 28. Defendants concede that the machine had been built by UPM "utilizing in part Dan-Web technology." D.I. 63 at 49. However, defendants argue the UPM/Walkisoft agreement "makes absolutely no reference to Dan-Web technology, that the machine "is clearly, by its terms, a UPM machine", and that "the machinery involved non-Dan-Web technology." D.I. 46 at 19, 20.

While these latter remarks may be accurate, they do not prevent the machine sold by UPM from qualifying as a "Product". The definition employed in the 1989 Settlement Agreement is far too broad. The use of any Dan-Web technology, or the inclusion of any Dan-Web components, by definition, qualifies the subject

Page 15

matter of any transaction as a "Product". Because the defendants do not dispute that the machine sold to Walkisoft contained at least some Dan-Web technology, the machine qualifies as a "Product" under the terms of the Agreement.

### b. "DW Seller"

Under the Settlement Agreement, those who would qualify as a "DW Seller", [*49] include "other person operating under a license, release assignment or other arrangement with DW . . . ." D.I. 47 at A, § 4(a). There is no question that UPM had purchased a license from Dan-Web. Defendants would have the Court look beyond this and inquire as to whether UPM was "operating under a license" when it made the sale. Defendants argue that this clause would only apply if UPM had been licensed to sell, as Flakt has been.

In determining whether or not UPM had been licensed to sell, the Court looks to the licensing agreement UPM signed with Dan-Web. The UPM Agreement, by its terms, does not expressly license UPM to sell machines into the United States. Instead, it grants a "limited non-exclusive license to deliver, build, install and operate one (1) latex-bonded dry forming production line in the USA . . . ." D.I. 61 at Tab 7, § 1.01.

To determine if this license was in fact a license to sell, however, the Court will not ignore defendant Mosgaard's letter of December 17, 1990 in which he stated, "As you know, UPM is a direct competitor of Dan-Web and Dan-Web has granted UPM a licensing agreement for certain machines to be sold in Europe and one in the US." D.I. 61 at [*50] Tab 4. In this letter, Mosgaard appears to admit that the license to UPM was, in fact, a license to sell one machine into the United States.

If UPM had been licensed to sell, and sold a machine, a commission would be due. If, however, UPM only had a license to use certain technology and it sold a machine into the United States, no commission would be due because that entity was not "operating under a license" when it sold the machine. In this instance, defendants did not expressly license UPM to sell a machine into the United States, as it has Flakt. However, Mosgaard's letter raises an issue of fact as to whether or not the license was a license to sell and this issue will be reserved for trial.

### c. The Resale Provision

In arguing that they are owed a commission on the UPM Walkisoft transaction, plaintiffs also rely on the Settlement Agreement's Resale Provision. D.I. 54 at 30-32. The Resale Provision does not look only to the presence of a "Product", a "DW Seller", a "Customer" and a "Sale" - the four elements named above. The Resale Provision applies when two transactions have occurred.

In the initial transaction, the Provision still requires a "DW Seller" to [*51] make a "Sale" of "any Products". These three elements have been met here since Dan-Web, as a "DW Seller", completed a "Sale" in licensing the technology, a "Product". The Provision alters the definition of "Customer" by applying to "a Customer whose principal place of business is outside the Territory". Here a "Customer" is present because UPM's principal place of business is outside the Territory. The prerequisites for the initial transaction have been met.

In the second transaction, the Provision requires the "Customer" in question to make another "Sale" of "the Product" into the "Territory". Here, the "Customer", UPM, has sold Dan-Web technology into the "Territory". As explained above, under the Resale Provision, the second transaction does not require the presence of a "DW Seller", as previously defined. The second transaction was a "Sale" under the terms of the Settlement Agreement since UPM actually did sell the machine to Walkisoft.

A distinct problem arises with regard to "Product" in the second transaction. In the first transaction, the Resale Provision requires the "Sale" of "any Products" from a DW Seller. As discussed above, the Dan-Web-UPM transaction involved [*52] a "Product" since defendant has not disputed that some Dan-Web technology had been involved. In the second transaction, the Resale Provision does not refer to "any Product" but instead refers to "the Product".

On this point, the provision could be read in two manners. Both readings have common ground since it is indisputable that the first transaction's requirement of "any Products" refers to the broad definition discussed above. The meaning ascribed to the latter transaction's reference to "the Product" is more difficult.

In the interpretation most beneficial to the defendants, the use of the word "the" in the second transaction would limit which Product may be involved. "The Product" of the second transaction would be a reference only to whatever Product was involved in the first transaction. The first transaction could be any product among the wide range included in the definition, but "the Product" in the second transaction would have to be the same product which was originally sold.

This construction would mean the resale provision only applies to distribution by a third party of Dan-Web's products. As soon as the third party added, or

modified, the Dan-Web product, Dan-Web [*53] would no longer be responsible for commissions. This analysis would exclude the UPM-Walkisoft transaction from qualifying under the Resale Provision since the Product licensed to UPM, the technology, was not the Product sold by UPM, the actual machine. If this construction were used, the issue arises as to which figure, the amount originally paid to Dan-Web or the amount paid by the third party in the subsequent transaction or the figure attributable to the Dan-Web technology within the UPM-Walkisoft sale, would be used to calculate the appropriate commission. Section four (c) of the Settlement Agreement, which governs calculation of commissions, is not clear. n21

--------------- Footnotes ---------------

n21 Section four, paragraph (c) states,

The payments shall be calculated by applying the applicable percentage set forth in section 4(b) to the Sales Proceeds as reflected on the face of the Purchase Contract as sent by the Customer to, or otherwise received by, the DW Seller after deducting shipping costs and duties paid by the DW Seller (the "Sales Proceeds").

D.I. 47 at A, § 4(c). Because this provision relies upon the terms "Customer" and "DW Seller", it applies more readily to two party "Sales". Since the Resale Provision uses both the terms "Sale" and "Sells", it is not clear how it would apply to resale transactions.

------------ End Footnotes---------------

[*54]
In the other possible interpretation, the word "the" would not mean that the second transaction must involve exactly the same product as the first transaction. Instead, the second transaction must only incorporate, or utilize, the Product which had been the subject of the first transaction. As long as there is a sufficient connection between the product originally sold, and the product subsequently resold, the resale provision would apply. As discussed above, the defendants have conceded that the machine had been built by UPM "utilizing in part Dan-Web technology". D.I. 63 at 49.

There being two reasonable interpretations of the Resale Provision, as well a an issue of fact as to the UPM license, plaintiffs' and defendants' motion for summary judgment will be denied on the Walkisoft transaction.

## B. The Reporting Requirements

Plaintiffs also seek summary judgment based upon defendants alleged failure to comply with the Reporting Requirements of the Settlement Agreement. Defendants acknowledge they have not complied, but argue the provisions of the Agreement in question were subsequently modified in a letter from plaintiff Conley and that the acceptance of payment in [*55] the letter of September 24 constituted an "accord and satisfaction". D.I. 63 at 52-53.

Turning first to the Settlement Agreement's own terms, defendants' modification argument must fail. Section 14(e) of the Agreement states, "This agreement may not be modified, rescinded, or terminated orally, and no modification, rescission or attempted waiver of any of the provisions hereof (including this paragraph) shall be valid unless in writing, supported by consideration, and signed by the parties against whom the same is sought to be enforced." D.I. 47 at A, § 14(e). The pertinent part of the letter which, in defendants' view, modified the Settlement Agreement states,

Both Clark and I feel that the Certification regarding sales in the Territory should be done in accordance with our Agreement. This document does not have to be a lengthy document, a single page will probably do -- however it a) should confirm what if any sales and/or services in accordance with the Agreement have been made and b) should be certified by both DW's Chartered Accountant and the Chief Financial Officer of DW.

D.I. 64 at X. Defendants rely upon plaintiffs' statement that "a single page will probably do" [*56] as an offer to modify the terms of the Settlement Agreement. However, read in conjunction with the plaintiffs' request that "Certification regarding sales in the Territory should be done in accordance with our Agreement," the letter does not constitute a modification. Rather, plaintiffs were demanding compliance with the Settlement Agreement and describing the least burdensome manner in which they felt compliance could be accomplished.

Defendants have also alleged that the one check sent to and accepted by plaintiffs constitutes an accord and satisfaction. D.I. 63 at 52-53. Because plaintiffs cashed the check sent to them, defendants maintain "a jury must determine if plaintiffs agreed to the less formal requirements . . . ." Id.

Page 17

[HN12]To find an accord and satisfaction, the law of Delaware requires "there must not only be a new agreement based on an offer, and the acceptance of that offer, as made, like any other contract, but that agreement must also be acted on." Ashland Coal & Coke Co. v. Old Ben Coal Corporation, 187 A. 596, 597 (Del. Super. Ct. 1934); see Restatement (Second) of Contracts, § 281 ("An accord is a contract through which an [*57] obligee promises to accept a stated performance in satisfaction of the obligor's existing duty. Performance of the accord discharges the original duty."). In addition, there must be a factual basis to show that the accord and satisfaction resulted from a "bona fide dispute based on mutual good faith." Cummings v. Finder, 574 A.2d 843, 845 (Del. 1990). Acceptance of a check may amount to the acceptance of new contract terms, if the check itself amounts to an offer. Id. State, for the Use of Warner Co. v. Massachusetts Bonding & Insurance Co., 9 A.2d 77, 80 (Del. Super. Ct. 1939). See Restatement (Second) of Contracts, § 281, comment d (finding an accord and satisfaction when creditor cashes check marked "payment in full").

In Ashland Coal & Coke, the court found the checks involved were accompanied by vouchers which advised that the checks were "in full settlement of account in accordance with the agreement . . . ." Id. As the Court pointed out "the Checks drawn . . . were clearly conditional offers to fully settle disputed claims . . . ." Id. at 597. The defendants' letters which accompanied the checks [*58] at issue here contained no such language. D.I. 61 at Tab 28. Indeed, the letters contain no language which could represent the enclosed checks as an offer to settle a good faith dispute. Without any such language, the letters could not amount to an offer, and the accord and satisfaction argument must fail.

Even if such language had been included, an accord and satisfaction could only have been present as to the claims which the check was meant to cover. The check at issue here referred to certain sales made in the period from January through June 1990. Id. If an accord and satisfaction were to be found at all, it would only cover the plaintiffs' claims for the sales to which the letter referred. It would not, as defendants contend, work to alter the reporting requirements of the Settlement Agreement.

Summary judgment will be granted to plaintiffs upon the second count.

### C. Best Efforts

In their third count, plaintiffs assert that defendants' alleged failure to provide commissions, their noncompliance with the reporting requirements and their assertion of "wholly unfounded and frivolous claims" as to plaintiffs' breach of the agreement, together constitute a violation [*59] of section five and paragraph (f) of section ten of the Agreement. D.I. 54 at 47-48. Specifically, in their complaint, plaintiffs alleged that "defendants have failed to use their best efforts to comply with the provisions of the Agreement". D.I. 1 at P 55. Both defendants and plaintiffs have crossed moved for summary judgment on "best efforts" issue.

Section five states, in its entirety, "DW, SWNA, Scan-web I/S and Purchasers will each use their best efforts to maximize the Sales in the Territory of DW Products and Purchaser, DW and SWNA shall use their best efforts to cause DW, SWNA, Scan-web I/S and any DW Sellers and Purchasers to fulfill each of their obligations under this Agreement." Plaintiffs have not alleged that defendants have failed to "maximize the Sales in the Territory." Instead, their argument rests solely upon the latter portion of section five, the failure to fulfill obligations under the Agreement.

[HN13]Under Delaware law, "best efforts" clauses have been held enforceable and "the failure of a party to exercise best efforts can form the basis for liability in a breach of contract action." Corwin et al. v. deTrey et al., C.A. No. 6808, slip op. at 5 (Del. Ch. [*60] Dec. 1, 1989). See also Eckmar Corp. v. Malchin, 297 A.2d 446, 450 (Del. Ch. 1972). As in Corwin, best efforts clauses often arise in circumstances in which the completion of contractual obligations requires certain conditions to occur or not to occur. The best efforts clause often insures the parties will do their best to accomplish the conditions necessary to complete the contract.

Plaintiffs have alleged defendants did not fulfill their otherwise outstanding obligations under the Agreement. Referring again to the rule of construction requiring all the terms of a contract be given meaning the best efforts clause of section five should be read to provide some additional obligation upon the defendants.

As other provisions of the Settlement Agreement already defined the defendants' obligations, section five must be read to impose an obligation beyond the express terms of the contract. Under these circumstances, in order to prevent the section from being redundant, section five must be read to mean that not only must defendants comply with the Settlement Agreement's requirements, but they also must use their best efforts to do so.

Courts in other [*61] jurisdictions have interpreted best efforts clause as matter of law. See NBT Bancorp, Inc. v. Fleet/Norstar Financial Group, Inc.,

Page 18

553 N.Y.S. 2d 864, 867 (N.Y. App. Div. 1990) (holding as a matter of law that defendant's agreement to use best efforts to secure shareholder approval was not violated when Board considered alternative offer because fiduciary duties required consideration of the offer). Great Western Producers Co-operative v. Great Western United Corporation, 613 P.2d 873, 877, 878 (Colo. 1980) (statutory obligations of directors tempered the obligation to complete merger pursuant to a best efforts clause). Such cases however, relied upon outstanding duties of one of the parties which made compliance with the best efforts clause impracticable. No such duty has been alleged by the defendants here.

Determination of this issue requires the Court to consider not only that the defendants failed, but why the defendants failed. Looking specifically at the reporting requirements, it is clear defendants have not complied. Unlike the cases cited above, the defendants here have offered no explanation as to why the [*62] reporting requirements were not satisfied. n22 Because plaintiffs have adequately shown defendant's failure to comply, and because defendants have offered no sufficient explanation of their behavior, summary judgment will be granted to plaintiffs on the reporting requirement issue.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n22 One possible, although unsatisfactory, explanation could be defendants' concern for the activities of plaintiff Conley and the potential violation of the covenant not to compete. Under the terms of the Settlement Agreement, however, the covenant not to compete was signed in consideration for payments, not for the reports. D.I. 47 at A, § 4(b). Any potential violation of the covenant not to compete would excuse nonpayment of commissions, but would not expressly excuse failure to report properly. Furthermore, even if Conley had violated the covenant, and that violation excused the defendants from reporting to him, Conley's violation could not have obviated the need to report to Poland.

- - - - - - - - - - - - End Footnotes- - - - - - - -

### D. The Non-compete Clause

Both the [*63] defendants and plaintiffs have moved for summary judgment as to plaintiffs' alleged breach of the Non-compete Clause of section eight. In section eight Conley and Poland agreed that "until April 20, 1994, [each] will not own, manage, operate, control, or be employed by or participate in the ownership, management, operation or control of any business whose purpose is selling air-forming equipment in the Territory that is equivalent to DW's products." D.I. 47 at A, § 8.

[HN14]Under Delaware law, covenants not to compete "are enforceable in equity provided the imposed restraint is reasonable both as to its geographic extent and as to the burden it places upon the person who covenants not to compete by engaging in a particular form of business activity." Tull v. Turek, 147 A.2d 658, 661 (Del. 1958); Comfort v. McDonald, C.A. No. 1066(S), 9 Del J.Corp. L. 420 (Del. Ch. 1984). See also Restatement (Second) of Contracts, § 188, comment g. As in Tull, the parties here mainly dispute whether plaintiffs have violated the covenant.

With respect to plaintiff Poland, defendants have only asserted that he "visited the Walkisoft [*64] plant and met with a UPM representative . . . and . . . continued to speak with Conley regarding Walkisoft activities." D.I. 63 at 46. These allegations do not meet the restrictions which disallow plaintiffs to "own, manage, operate, control, or be employed by or participate in the ownership, management, operation or control" of a business which sells air-forming equipment. Plaintiffs' motion for summary judgment with respect to plaintiff Poland will be granted.

With respect to plaintiff Conley, the parties do not dispute that plaintiff Conley did a study for UPM and was employed by Walkisoft. n23 Under the terms of section eight in the 1989 Agreement, the issue is what purpose UPM and Walkisoft had at the time Conley maintained his association with them.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n23 In their counterclaim, defendants also point to a meeting which Conley allegedly attended on behalf of Walkisoft. D.I. 4 at P 24(f). This allegation, however, adds nothing to the conceded fact that Conley was employed by Walkisoft. Given Conley's employment at Walkisoft, the issue becomes whether Walkisoft was a "business whose purpose is selling air forming equipment in the Territory that is equivalent to [Dan-Web's] products." D.I. 47 at A, § 8. Conley's specific actions as an employee do not amount to a separate breach of the covenant not to compete, although they may illuminate the

"purpose" of Walkisoft and should be considered in that context.

- - - - - - - - - - - - End Footnotes - - - - - - - -
- - - - - -

[*65]

The record does not reflect any evidence to raise a genuine issue of material fact with respect to Walkisoft. Defendants' own brief recites that "Walkisoft is using a machine to make air laid product, sold to it by UPM." D.I. 63 at 39. Defendant also remarks that plaintiff Conley "was going to many of the same customers he had gone to as a salesman of Dan-Web technology and attempted to convince them to buy paper instead of the technology." Id. at 44. The covenant not to compete does not cover working to sell paper. There is no evidence in the record that Walkisoft has, or has ever planned to, sell anything but a finished paper product. Defendants can point to no instance in which Walkisoft has sold anything resembling "air-forming equipment." D.I. 47 at A, § 8. In the complete absence of any such transactions, Walkisoft could not have maintained a "purpose" to sell the equipment. As no genuine issue of material fact arises as to Walkisoft's purpose, summary judgment will be entered on behalf of the plaintiffs on the issue of Conley's association with UPM.

The Court is unwilling to determine the "purpose" of UPM as a matter of fact. Plaintiffs' argument that UPM is a [*66] customer, not a competitor of Dan-Web does not directly address the covenant's focus. The covenant does not prevent employment with a competitor, but with a "business whose purpose is selling air-forming equipment in the Territory that is equivalent to DW's Products." D.I. 47 at A, § 8. The record reflects that UPM unquestionably sold air-forming equipment in the Territory. Moreover, discussions which took place before the dissolution of SWNA appear to indicate that UPM had considered marketing air-forming equipment in the United States as a business objective. D.I. 64 at CC, D.I. 25 at C. While plaintiff may accurately assert that these discussions were conducted under authorization by Dan-Web and that a cooperative, not competitive, motive was intended, this does not prevent the inference UPM has considered marketing air-forming equipment in the United States. On these so grounds, the Court is unwilling at this time to find that UPM has not had the purpose of selling air-forming equipment in the Territory. Poland's motion for summary judgment on the covenant not to compete issue will be granted and Conley's motion on the same issue will be denied.

## V. Conclusions

The [*67] conclusions reached by the Court in the claims surrounding the covenant not to compete impact directly upon the previous conclusions as to commissions due to the plaintiffs. The Court has found that the plaintiffs are entitled to summary judgment on the Flakt Agreement. See supra 32-33. The commissions due to the plaintiffs become due under section four of the Settlement Agreement. That section, entitled "Payments for Restrictive Covenants", states that payments will be made "As consideration for the covenant not to compete . . . ." D.I. 47 at A, § 4(b).

[HN15]For plaintiffs to recover any damages under Delaware law, they first must show "freedom from fault with respect to performance of dependent promises, counterpromises or conditions precedent." Hudson v. D & V Mason Contractors, Inc., 252 A.2d 166, 170 (Del. Super. Ct. 1969); Restatement (Second) of Contracts, §§ 237, 240. If the restrictive covenant has been violated, defendants will not have to pay the commissions during the time in which the covenant was violated.

With respect to plaintiff Poland, the Court will grant summary judgment on the covenant not to compete, and Mr. Poland will recover [*68] any damages which may be due. n24 With respect to Mr. Conley, however, the Court will deny summary judgment because there is an issue of fact as to whether or not UPM had the purpose of selling air-forming equipment in the United States during all or part of the time covered by the Settlement Agreement. These issues bear directly on the amount which plaintiff Conley can recover under the Agreement and will be reserved for trial.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n24 The Agreement provides for severing the interests of plaintiffs Poland and Conley. D.I. 47 at A, § 14(f) ("No breach of this Agreement solely by one of the Sellers [Poland and Conley] shall have any impact upon or alter the rights and remedies of the other Seller; provided further that in the event one of the Sellers breaches this Agreement, the other Seller shall not be entitled to receive more than 50% of the Payments.").

- - - - - - - - - - - - End Footnotes - - - - - - - -
- - - - - -

For the forgoing reasons, summary judgment will be granted in part and denied in part as to the plaintiffs'

first count. The first count of the complaint has three [*69] components: the Flakt Agreement, the UPM Agreement, and the Walkisoft sale. Summary judgment will be granted to defendants on the issue of the individual liability of Kongsted and Mosgaard for any commissions due under the Settlement Agreement because of these transactions. Summary judgment will be granted as to the liability of defendants on plaintiffs' claim for a commission under the Flakt Agreement, however damages have not been determined. Summary judgment will be denied to plaintiffs on their second claim, concerning the UPM Agreement, and will also be denied to both plaintiffs and defendants on the plaintiffs' third claim concerning the sale from UPM to Walkisoft.

On plaintiff's second count, the reporting requirements, summary judgment will be granted for the plaintiffs. Plaintiffs will also be granted summary judgment, and defendants denied it, on plaintiffs' third count, the breach of the best efforts clause. On the plaintiffs' fourth count, seeking a declaratory judgment on the covenant not to compete, and defendants' second counterclaim, asserting plaintiffs violated the covenant, summary judgment will be granted as to plaintiff Poland, and as to plaintiff Conley's [*70] association with Walkisoft. However, summary judgment will be denied with regard to Conley's association with UPM. Finally, on defendants' first counterclaim, summary judgment will be granted for the plaintiffs.

An appropriate order will issue.